GLAD TIDINGS ASSEMBLY OF GOD, A NEBRASKA NOT-FOR-PROFIT CORPORATION, APPELLANT AND CROSS-APPELLEE, V. NEBRASKA DISTRICT COUNCIL OF THE ASSEMBLIES OF GOD, INC., A NEBRASKA NOT-FOR-PROFIT CORPORATION, ET AL., APPELLEES AND CROSS-APPELLANTS.

734 N.W.2d 731

Filed July 13, 2007. No. S-06-145.

Jack W. Besse, of Knapp, Fangmeyer, Ashwege, Besse & Marsh, P.C., for appellant.

Jerald L. Rauterkus and Jason R. Yungtum, of Erickson, Sederstrom, P.C., for appellees.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Glad Tidings Assembly of God (Glad Tidings) brought this action against the Nebraska District Council of the Assemblies of God, Inc. (District Council), and members of Glad Tidings' board of directors (Board). Glad Tidings alleged that the Board acted outside its authority when it closed Glad Tidings and transferred its property to the District Council.

This appeal presents two issues: (1) whether church members voted to close the church and (2) whether a conflict of interest existed involving directors who were also District Council officials. The county court found that by standing in unison, the church members voted to close the church, and that the directors did not have a conflict of interest. The district court affirmed.

We conclude that (1) when the church members stood in unison, they voted to close the church, and the church property reverted to the District Council under Glad Tidings' bylaws, and (2) no transaction occurred which would subject the directors to liability. We affirm.

## BACKGROUND

### CHURCH ORGANIZATION

Glad Tidings is a church in Gibbon, Buffalo County, Nebraska. It is a district-affiliated church of the District Council, meaning

it has fewer than 20 members. Glad Tidings, a Nebraska non-profit corporation, owns property in its name, including real estate. Under Glad Tidings' constitution and bylaws, however, all of its property reverts to the District Council if it ceases to function as a church.

In Nebraska, the District Council is the governing body for all Assemblies of God churches. It consists of 10 presbyters, nominated from 10 geographic sections throughout the state, and 3 elected officers: a superintendent, assistant superintendent, and a secretary-treasurer. The next level of governance for a district-affiliated church is the church's board of directors. Glad Tidings' Board consisted of the District Council superintendent, the geographic presbyter from Glad Tidings' section, and Glad Tidings' pastor. At all relevant times, Robert Nazarenus, the superintendent; Robert Wine, the presbyter; and Alex Brodine, the local pastor, made up Glad Tidings' Board. Wine also served as the pastor of New Life Assembly in Kearney, Nebraska (New Life), and Brodine served in a mentorship position at New Life.

District-affiliated churches may also have an advisory board, which serves under the District Council and the church's board of directors. Glad Tidings previously had an advisory board consisting of three church members; however, two of the advisory board members resigned in July 2003. The church did not appoint anyone to replace them, and the board has since ceased to function.

### Glad Tidings' Operational Difficulties

For several years, Glad Tidings had operational problems. Dorothy Miller, a member of Glad Tidings for about 10 years, began serving on the advisory board in January 2003. She testified that the congregation had problems with a new pastor who came to Glad Tidings in June 2001. Miller stated the pastor's spending concerned the church members. She also stated tensions arose between the church and the District Council because the District Council failed to give sufficient help. The record reflects that for several years, Glad Tidings lacked leadership and direction. The District Council believed that the church had failed in evangelization, discipleship, and growth.

In August or September 2003, the District Council appointed Brodine as an interim pastor. The District Council and the Board decided that Glad Tidings was dysfunctional and needed significant change. The Board presented three options to the congregation: (1) appoint a new pastor and continue the status quo, (2) close the church and "replant" it (i.e., reopen it with a fresh start), or (3) affiliate with New Life in Kearney. The Board members, however, expressed that continuing the status quo was not a good option, and they would not appoint a new pastor.

## Glad Tidings Closes

On January 18, 2004, Wine and Brodine held a meeting with the Glad Tidings congregation to decide the church's future. They discussed whether to join with New Life. During the meeting, the record shows the members clearly did not want to join with New Life; Miller stood up and stated that she did not want to become a part of New Life and that if Glad Tidings were going to close, she wanted it to do so immediately. Then, the other church members stood as well. Wine testified that he asked if by standing, the members were showing that they wanted to close the church and have the property revert to the District Council. Wine and Brodine testified that the members confirmed that was their intent. But Glad Tidings contends the members were only standing to show that they would not join New Life—not that they wanted to close the church.

After the January 18, 2004, meeting, the District Council required that Glad Tidings members turn over all church property to it. The property included a safe-deposit box containing church documents and a certificate of deposit worth about $2,500. Brodine closed Glad Tidings' checking and savings accounts containing about $1,400. Wine testified that the District Council combined Glad Tidings' funds with New Life's general fund and used it to pay Glad Tidings' utilities and maintenance expenses.

Glad Tidings has not held church services since January 18, 2004, and church members have not had access to the building because the District Council changed the locks on January 21. New Life has used the church building for ministry activities in the Gibbon community. Glad Tidings still exists as a nonprofit corporation.

GLAD TIDINGS' LAWSUIT

Glad Tidings brought this action against the District Council and the Board members. It sought a declaration that the Board exceeded its authority by transferring the church assets to the District Council. Glad Tidings alleged that the members did not vote to close the church or dispose of the property. The county court, however, determined that the members signified their vote to close the church by standing with Miller at the January 18, 2004, meeting. Further, the court found they were aware that by voting to close the church, they were also voting to dispose of the property because the property would revert to the District Council.

Glad Tidings had also argued that board members Wine and Nazarenus had conflicts of interest because they held positions on the District Council and benefited from receiving Glad Tidings' property. Nevertheless, the county court found no genuine issue of material fact regarding a conflict of interest and entered summary judgment for the District Council.

Glad Tidings appealed to the district court. The district court affirmed the county court's decision.

## ASSIGNMENTS OF ERROR

Glad Tidings assigns, renumbered and restated, that the trial court erred in (1) finding that church members voted to close the church and dispose of its assets and (2) granting summary judgment to the District Council and the Board regarding whether the Board had conflicts of interest.

On cross-appeal, the District Council and the Board assign, restated, that the trial court erred in failing to grant it summary judgment because the First Amendment precluded the adjudication of the case.

## STANDARD OF REVIEW

■ In a declaratory judgment action treated as an action at law, we do not disturb factual determinations unless they are clearly wrong.[1]

■ Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue

---

[1] See *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003).

regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[2] In reviewing a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment is granted and give such party the benefit of all reasonable inferences deducible from the evidence.[3]

## ANALYSIS

### THE CHURCH MEMBERS VOTED TO CLOSE THE CHURCH

Glad Tidings contends that its members did not authorize the Board to close the church and dispose of its property. Glad Tidings relies on Neb. Rev. Stat. § 21-19,126 (Reissue 1997). This statute permits a nonprofit corporation to "dispose of all or substantially all of its property" when the transaction is approved "[b]y the members by two-thirds of the votes cast or a majority of the voting power," unless the corporation's bylaws require a greater vote. Glad Tidings' bylaws require a two-thirds vote by the membership present at a regular or special meeting for any assembly property to be "sold, leased, mortgaged, or otherwise alienated." The bylaws also provide that if the assembly "ceases to function as a church body," its property shall revert to the District Council.

Glad Tidings argues that the action the members took at the January 18, 2004, meeting was not a vote either to close the church or to dispose of its property. Church members testified that they did not vote to close the church by standing in unison. Instead, they were only opposed to joining New Life. Yet according to Wine and Brodine, Wine asked the members whether by standing, they were voting to close the church and transfer the church property to the District Council. Wine and Brodine further testified that the members confirmed this was their intent, verbally and nonverbally, and that no one objected.

 The record shows conflicting evidence before the county court. In a bench trial, the judge sitting as the trier of fact is

[2] *Willet v. County of Lancaster*, 271 Neb. 570, 713 N.W.2d 483 (2006).

[3] *Brodine v. Blue Cross Blue Shield*, 272 Neb. 713, 724 N.W.2d 321 (2006).

the sole judge of the credibility of the witnesses, and we do not reweigh the evidence on appeal.[4] Here, the county court determined that—by standing in unison—the members voted to close the church. It also found the members knew such a vote would cause the church property to revert to the District Council.

Glad Tidings argues, however, that no vote occurred because the church did not follow the proper procedure to take a vote, i.e., by using motions and seconds. Neither Glad Tidings' bylaws nor Nebraska statutes require a particular procedure.[5] A "vote" can be expressed "by ballot, show of hands, or other type of communication."[6] For example, a "standing vote" occurs when each voter "stand[s] up when his or her side of the question is counted," and a "voice vote" can occur when "the voters collectively [answer] aloud."[7] Wine testified he did not use formal parliamentary procedure so the meeting would not feel "harsh or cold" and to avoid intimidating the small group. Despite the lack of formality, the congregation expressed its decision regarding the church's future through standing, nodding, and verbally responding when Wine questioned the members about their intent.

We conclude that the congregation voted to close the church. The church members were aware that by closing the church, the church property would revert to the District Council by operation of the bylaws. The district court did not clearly err in determining that the members voted to close the church and dispose of the property.

### No Conflict of Interest Transaction Occurred Under § 21-1987

Glad Tidings contends that Wine and Nazarenus had conflicts of interest because they were on Glad Tidings' Board and held positions with the District Council, which received Glad Tidings' property when it closed. Neb. Rev. Stat. § 21-1987

---

[4] *Waite v. A.S. Battiato Co.*, 238 Neb. 151, 469 N.W.2d 766 (1991).

[5] See Neb. Rev. Stat. § 21-1914(32) (Reissue 1997).

[6] Black's Law Dictionary 1606 (8th ed. 2004).

[7] *Id.* at 1607.

(Reissue 1997) defines a conflict of interest transaction as "a transaction with the corporation in which a director of the corporation has a direct or indirect interest." Glad Tidings alleges that the transfer of property to the District Council was a transaction under this section. The District Council counters that § 21-1987 does not apply because no transaction occurred.

The Nebraska Nonprofit Corporation Act does not define the term "transaction." The Model Nonprofit Corporation Act, upon which Nebraska's act is based, is also silent on what comprises a transaction. However, the Model Business Corporation Act (MBCA) contains a similar provision in § 8.60. And the comments provide guidance regarding what is a transaction.

The official comment to § 8.60 states that "[t]o constitute a director's conflicting interest transaction, there must first be a transaction by the corporation, its subsidiary, or controlled entity . . . ."[8] The introductory comment to subchapter F, in which § 8.60 is contained, elaborates further:

> [T]he subchapter is applicable only when there is a "transaction" by or with the corporation. For purposes of subchapter F, "transaction" generally connotes negotiations or a consensual bilateral arrangement between the corporation and another party or parties that concern their respective and differing economic rights or interests—not simply a unilateral action by the corporation but rather a "deal."

In *Mueller v. Zimmer*,[9] the Wyoming Supreme Court consulted the MBCA's comments in addressing a conflict of interest argument under a statute identical to § 21-1987. The corporation managed a recreational residential subdivision, and it had a policy of reimbursing directors for expenses incurred while performing their duties. One director was also a partner in a law firm, and he used his law firm's resources in performing his duties as a director. He then sought reimbursement for the expenses incurred by the law firm. The corporation's members alleged that the reimbursement was a conflict-of-interest transaction, which required specific board approval. The Wyoming

---

[8] 2 Model Business Corporation Act Ann. § 8.60, official comment at 8-382 to 8-383 (3d ed. 2002).

[9] *Mueller v. Zimmer*, 124 P.3d 340 (Wyo. 2005).

court, however, determined that under the MBCA's definition, a transaction had not occurred. The court observed that the MBCA's definition is also consistent with the plain meaning of the word:

> 1. The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract. 2. Something performed or carried out; a business agreement or exchange. 3. Any activity involving two or more persons. 4. *Civil law.* An agreement that is intended by the parties to prevent or end a dispute and in which they make reciprocal concessions.[10]

The court in *Mueller* held that the reimbursement of a director's expenses was not the type of corporate action the Legislature designed the statute to cover. No negotiations, no bilateral arrangement, and no "'deal'" occurred between the corporation and another party.[11] Instead, the reimbursement was a policy choice.

We conclude that the MBCA's description of the term "transaction" is the appropriate definition of that term under § 21-1987. As in *Mueller*, no negotiations or mutual agreement occurred between the parties that would constitute a transaction as that term is used in the Nebraska Nonprofit Corporation Act. Instead, the church members voted to close the church. As stated in Glad Tidings' bylaws, church policy mandated that the assets reverted to the District Council when the church ceased to function. Summing up, the record does not show a "deal" between Glad Tidings and the District Council.

█ In reviewing the county court's granting summary judgment, we look to these familiar principles: Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[12] The party moving for summary judgment has the burden

---

[10] Black's Law Dictionary, *supra* note 6 at 1535. See, also, *Mueller v. Zimmer, supra* note 9.

[11] *Mueller v. Zimmer, supra* note 9, 124 P.3d at 358.

[12] *Willet v. County of Lancaster, supra* note 2.

to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate it is entitled to judgment as a matter of law.[13] A movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to a judgment if the evidence were uncontroverted at trial. Then, the burden of producing evidence shifts to the party opposing the motion.[14] The undisputed facts show that no transaction occurred because no agreement or negotiations took place between the District Council and Glad Tidings for the transfer of the property. Instead, the property reverted to the District Council by operation of Glad Tidings' bylaws.

## CONCLUSION

The Board did not violate § 21-19,126 by transferring Glad Tidings' property. The church members voted to close the church, and as a result, the property reverted to the District Council through the bylaws. Also, the transfer of property was not a transaction under § 21-1987 because it was the result of an internal decision by the corporation, instead of a bilateral arrangement with another party. Thus, the conflict-of-interest provision does not apply. Having determined that the Board legally transferred Glad Tidings' property to the District Council, we need not address the District Council's cross-appeal. We affirm.

AFFIRMED.

---

[13] *Id.*

[14] *Cerny v. Longley*, 270 Neb. 706, 708 N.W.2d 219 (2005).