748 N.W.2d 626 (2008)
275 Neb. 642
AON CONSULTING, INC., Appellant and Cross-Appellee,
v.
MIDLANDS FINANCIAL BENEFITS, INC., Appellee and Cross-Appellant.
Aon Consulting, Inc., Appellee and Cross-Appellant,
v.
William Pearson, Appellant and Cross-Appellee.
Nos. S-06-1256, S-07-034.
Supreme Court of Nebraska.
May 9, 2008.
*632 Richard J. Gilloon and Bradley B. Mallberg, of Erickson & Sederstrom, P.C., Omaha, for appellant Aon Consulting, Inc.
Mark A. Fahleson, of Rembolt Ludtke, L.L.P., Lincoln, for appellee Midlands Financial Benefits, Inc.
Frederick S. Cassman and Frank F. Pospishil, of Abrahams, Kaslow & Cassman, Omaha, for appellant William Pearson.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
While employed by Alexander & Alexander Services Inc. (A & A) in 1981, William Pearson signed an agreement which restricted his ability to solicit business from certain customers of the firm for 2 years after leaving its employment. Aon Consulting, Inc. (Aon), merged with A & A in 1997, and Pearson remained as an officer and employee of Aon until 2001, when he resigned and joined a competitor, Midlands Financial Benefits, Inc. (Midlands). In his new employment, Pearson solicited business from Aon customers with whom he had personal business relationships while employed by Aon. Aon sued Pearson for breach of contract and was awarded a money judgment from which Pearson appeals. Aon cross-appeals from the dismissal of its breach of fiduciary duty claim against Pearson. In a separate case, Aon sued Midlands for intentional interference *633 with a business relationship and appeals from a directed verdict of dismissal. We affirm the judgments of the district court in both cases.

I. BACKGROUND

1. FACTS
Both cases arise from the same factual circumstances. In 1981, Pearson began working for A & A as an account executive selling and servicing group health insurance plans. Several months later, he signed a nonsolicitation agreement. The agreement provided in relevant part:
[I]f your employment with A & A should terminate for any reason, you will not, directly or indirectly, for a period of two (2) years after the date of such termination of your employment, in any capacity whatsoever (either as an employee, officer, director, stockholder, proprietor, partner, joint venturer, consultant or otherwise), solicit, sell to, divert, serve, accept or receive insurance agency, brokerage or consulting business ... from any customer or active prospect of A & A which you personally, alone or in combination with others, handled, serviced or solicited at any time during the two (2) year period immediately preceeding termination of your employment.
....
In the event of your termination (except for death, permanent or total disability or retirement), A & A agrees that it will pay you a sum equivalent to (a) one (1) month's salary computed as of the date of such termination if such termination takes place within one year from the date hereof or (b) two (2) month's salary computed as of the date of such termination if such termination takes place after one year from the date hereof.
In 1990, Pearson became the manager of A & A's Lincoln, Nebraska, office and was given the title of vice president. In 1994, he became the manager of the Omaha, Nebraska, office as well. In 1996, in anticipation of the merger, A & A requested that Pearson sign a new nonsolicitation agreement that expressly stated it was assignable without his consent. Pearson declined to sign this agreement.
In 1997, Aon merged with A & A. Pearson continued to work for the company in the same capacity and performed the same duties. In March 2001, Aon relieved Pearson of his managerial and supervisory duties, although he remained designated as a vice president. Aon corporate minutes show that he was officially designated a vice president by Aon's board of directors. The record indicates that over 200 Aon employees were designated as "Vice Presidents" and that approximately 125 more were "Senior Vice Presidents."
Pearson became dissatisfied with his employment at Aon, and in the summer of 2001, he sought legal advice regarding the validity of the nonsolicitation agreement. His attorney advised him that the agreement was not enforceable because he was no longer employed by A & A, but, rather, by Aon, and more than 2 years had elapsed since he was last employed by A & A. In June or July 2001, Pearson contacted and met with a co-owner of Midlands, a Lincoln firm engaged in the business of financial planning and employee benefits programs. They discussed the possibility of Pearson's becoming employed by Midlands. Pearson and his Aon coworker Cathy Dorenbach met with the co-owners of Midlands again in July and September to discuss employment opportunities at Midlands. During one of these meetings, Pearson showed Midlands the nonsolicitation agreement and informed Midlands that his attorney had opined that it was *634 unenforceable. Midlands' co-owners testified that they did not recruit Pearson, nor did they expect him to solicit former Aon customers during his employment at Midlands. There is evidence that the sales goals which Midlands sets for its employees could have been met by Pearson without solicitation of Aon customers.
Dorenbach testified that she and Pearson began discussing their mutual unhappiness at Aon during the summer of 2001. On September 28, 2001, both Pearson and Dorenbach resigned from Aon and joined Midlands. Prior to resigning, both informed Aon customers with whom they worked that they would soon be leaving Aon. In some instances, they indicated that they would be employed by Midlands. Either just prior to or immediately after leaving, Pearson and Dorenbach helped customers prepare broker of record letters changing those customers' affiliations from Aon to Midlands. Dorenbach testified that she and Pearson independently made the decision to leave Aon, but that after the decision was made, they coordinated the time and date of their leaving. Dorenbach testified that Pearson was aware of her plans to leave Aon and was aware that she was contacting Aon customers and telling them of her plans prior to leaving. Pearson admitted that despite this knowledge, he did not inform anyone at Aon of Dorenbach's plans.
As employees of Midlands, both Pearson and Dorenbach were paid a commission of 50 percent of all revenues generated. Ultimately, 12 customers Pearson had served at Aon transferred their business to him at Midlands. Approximately 25 other Aon customers served by Dorenbach also transferred their business to her at Midlands. By January 2002, Midlands' management was aware that most of Pearson's business was being generated from former Aon customers.

2. CASE No. S-07-034: AON V. PEARSON
Aon sued Pearson in the district court for Douglas County, alleging, inter alia, that he had breached the nonsolicitation agreement and breached his fiduciary duty. Pearson answered, denying Aon's material allegations and specifically alleging that the nonsolicitation agreement was not enforceable by Aon. On cross-motions for summary judgment, the district court determined that the nonsolicitation agreement was valid and enforceable as an asset of A & A which became an asset of Aon following the merger. The court entered summary judgment for Aon on the issue of liability with respect to claims involving breach of the agreement. The court entered summary judgment in favor of Pearson with respect to Aon's claim alleging breach of fiduciary duty. The matter proceeded to a bench trial on the issue of damages, and the court entered judgment in favor of Aon in the amount of $123,063. After both parties' motions for new trial and motions to alter or amend the judgment were overruled, Pearson appealed, and Aon cross-appealed. That matter is before us as case No. S-07-034.

3. CASE No. S-06-1256: AON V. MIDLANDS
Aon filed an action in the same court against Midlands, alleging that by hiring Pearson with knowledge of the nonsolicitation agreement, it "unjustifiably and intentionally acted to interfere with, and to assist Pearson to breach" the agreement. In its answer, Midlands asserted a general denial and, in an affirmative defense, alleged that it had relied on Pearson's representation that "he had received a legal opinion that such Non-Solicitation Agreement was no longer valid or enforceable." Pursuant to a stipulation of the parties, the court consolidated the case with Aon's action against Pearson for both discovery and trial. At the consolidated trial, the court granted Midlands' motion *635 for a directed verdict at the close of Aon's evidence and dismissed the action. Aon appealed, and Midlands cross-appealed. We moved this appeal and case No. S-07-034 to our docket pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[1]
Although the two appeals were argued separately, we address and resolve both in this opinion.

II. ASSIGNMENTS OF ERROR
In case No. S-07-034, Pearson assigns, restated and consolidated, that the trial court erred in (1) finding that the nonsolicitation agreement was enforceable by Aon, (2) admitting the opinion of Aon's expert witness on lost profits, (3) calculating Aon's net lost profits, and (4) failing to allow it to amend its answer to conform to the evidence.
On cross-appeal in case No. S-07-034, Aon assigns that the trial court erred in (1) overruling its motion for summary judgment on the claim that Pearson breached his fiduciary duty as an officer of Aon, (2) dismissing its action against Pearson for breach of his fiduciary duty, (3) limiting its evidence of damages to the 2-year period identified in the nonsolicitation agreement, and (4) calculating damages by counting certain expenses twice and using the wrong ratio of expenses to revenue to calculate net lost profits.
In case No. S-06-1256, Aon assigns that the district court erred in (1) sustaining Midlands' motion for directed verdict and (2) sustaining Midlands' objection to Aon's evidence of damages beyond the 2-year period of the nonsolicitation agreement.
On cross-appeal in case No. S-06-1256, Midlands assigns that the trial court erred in (1) finding the nonsolicitation agreement was enforceable under Nebraska law and (2) finding that Aon had standing to enforce the nonsolicitation agreement.

III. STANDARD OF REVIEW
Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[2] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence.[3]
In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.[4] The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.[5]
*636 A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, when an issue should be decided as a matter of law.[6] The party against whom the verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence.[7] If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law.[8]

IV. ANALYSIS

1. ENFORCEABILITY OF NONSOLICITATION AGREEMENT
A legal issue common to both cases is whether the 1981 nonsolicitation agreement between Pearson and A & A was enforceable by Aon following Pearson's resignation in 2001. To resolve this question, we must determine (1) whether, as the district court held, the agreement became an asset of Aon by virtue of the merger with A & A and, if so, (2) whether the agreement was reasonable with respect to the nature and scope of the restrictions it imposed upon Pearson.

(a) Effect of Merger
Pearson and Midlands argue that A & A's rights under the non solicitation agreement were not assignable and that therefore, Aon had no right to enforce the agreement. Aon argues, and the district court held, that it acquired the right to enforce the agreement by operation of law as a result of the 1997 merger. The record includes documents pertaining to the merger which were received without objection. The "Agreement and Plan of Merger" expressly states that it is to be governed by the law of the State of Maryland, specifically the "General Corporation Law of the State of Maryland." The receipt of this evidence placed Pearson on notice that Maryland law governed the merger, and we therefore take judicial notice of the law of that state.[9]
The merger agreement specifically provides that the "[m]erger shall have the effects set forth in Section 3-114 of the [Maryland statutes]." Under that statute, the assets of each party to the merger "transfer to, vest in, and devolve on the successor without further act or deed."[10] "Assets" in this context are defined as "any tangible, intangible, real, or personal property or other assets, including goodwill and franchises."[11] Although no reported Maryland decision has applied these statutes to the question presented here, other state courts applying similar statutory language have concluded that a covenant not to compete is an asset which is transferred to and vests in the surviving entity of a merger by operation of law.[12] *637 In UARCO Inc. v. Lam,[13] the applicable Hawaii statute provided that after a statutory merger, the surviving corporation possessed "`all of the rights, privileges, immunities, and franchises.'" The court held that under this statute, a successor corporation could enforce a noncompetition agreement entered into by the corporation acquired by merger. The court reasoned that although such agreements were not assignable under Hawaii law, the enforcement right of the successor corporation passed by operation of law.
Similarly, in Corporate Exp. Office Products v. Phillips,[14] the applicable statute provided that after a merger, "`[t]he title to all real estate and other property, or any interest therein, owned by each corporation party to the merger is vested in the surviving corporation without reversion or impairment.'" Based on this language, the court concluded:
[T]he surviving corporation in a merger assumes the right to enforce a noncompete agreement entered into with an employee of the merged corporation by operation of law, and no assignment is necessary. This is because in a merger, the two corporations in essence unite into a single corporate existence.[15] Likewise, in Alexander & Alexander, Inc. v. Koelz,[16] the court reasoned that after a statutory merger, the surviving corporation succeeded to all the rights and liabilities of the preceding corporation under the applicable statutes, and thus the survivor could enforce a noncompetition agreement.
Pearson urges that we follow the reasoning of Smith, Bell & Hauck v. Cullins.[17] In that case, the Supreme Court of Vermont held that the purchaser of the assets of an insurance agency could not enforce an agreement not to compete between the former owner and an employee. A Vermont statute provided that in the event of a transfer of assets by sale, merger, or consolidation of different corporate entities, the acquiring corporation "shall possess all the rights, privileges and benefits of the original corporation properly exercisable under the laws of [Vermont]."[18] The court reasoned that because the agreement was personal to the original parties, it was incapable of effective assignment and therefore not "properly exercisable" by the new owner under Vermont law. We are not persuaded by this reasoning, primarily because the Vermont statute differs substantially from the Maryland statute which governs the effect of the corporate merger by which Aon acquired A & A.
We agree with those cases which hold, under statutes similar to Maryland's, that a covenant not to compete is an asset of a corporation which passes by operation of law to a successor corporation as the result of a merger, regardless of whether the agreement would otherwise be assignable. Accordingly, by virtue of the merger, *638 Aon succeeded to A & A's right to enforce its nonsolicitation agreement with Pearson.

(b) Scope and Reasonableness of Nonsolicitation Agreement
Approaching the issue of enforceability from a different perspective, Midlands argues that the nonsolicitation agreement was unenforceable under Nebraska law because it imposes broader restrictions than our law permits. In determining whether a covenant not to compete is valid, a court considers whether the restriction is (1) reasonable in the sense that it is not injurious to the public, (2) not greater than is reasonably necessary to protect the employer in some legitimate interest, and (3) not unduly harsh and oppressive on the employee.[19]
An employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but is not entitled to protection against ordinary competition from a former employee.[20] To distinguish between "ordinary competition" and "unfair competition," we have focused on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers.[21] Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair and the employer has a legitimate need for protection against the employee's competition.[22]
The nonsolicitation agreement signed by Pearson did not prevent him from engaging in "ordinary competition" with Aon after leaving its employment. It only prevented him from business contacts with those customers with whom he had personal business dealings during the last 2 years of his employment with Aon. The agreement was properly focused on the legitimate purpose of protecting Aon's goodwill with its customers. We conclude that the nonsolicitation agreement was reasonable in the sense that it is not injurious to the public, not greater than reasonably necessary to protect Aon's legitimate interest in retaining the goodwill of its customers with whom Pearson dealt personally, and not unduly harsh and oppressive on Pearson. Accordingly, we conclude that the agreement was enforceable under Nebraska law.

(c) Consideration
Midlands also argues that the nonsolicitation agreement was invalid for lack of consideration. It notes that Pearson was already employed by A & A when he signed the agreement and that he did not receive any bonus or additional compensation for doing so. Midlands argues that Pearson's continued employment after signing the agreement did not constitute adequate consideration.
We need not address this specific argument, because we conclude that the nonsolicitation agreement recites other consideration. Generally, sufficient consideration for an agreement will be found if there is some benefit to one of the *639 parties or a detriment to the other.[23] In the nonsolicitation agreement, A & A undertook to pay severance compensation in the event that Pearson left its employment for reasons other than death, disability, or retirement. This undertaking constituted a benefit to Pearson and a detriment to A & A which would not otherwise have existed in their employment relationship. The fact that Pearson claims not to have received a severance payment following termination does not alter the fact that A & A's agreement to make such payment constituted valid consideration for the nonsolicitation agreement.

(d) Summary
For the reasons discussed, we conclude that the nonsolicitation agreement between Pearson and A & A was valid under Nebraska law and that the right to enforce the agreement passed to Aon by operation of law when it acquired A & A by merger. It is undisputed that almost immediately upon leaving Aon's employment, Pearson became employed by Midlands and solicited business from Aon customers with whom he had personal business dealings within the last 2 years of his employment with Aon. Accordingly, the district court did not err in granting partial summary judgment in favor of Aon as to Pearson's liability for breach of the nonsolicitation agreement.

2. DAMAGES
Both Pearson and Aon assign error with respect to aspects of the district court's calculation of damages. Because the issues are interrelated, we address them together.

(a) General Principles
Certain general principles apply to Aon's claimed loss of profits resulting from Pearson's breach of the nonsolicitation agreement. In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole.[24] One injured by a breach of contract is entitled to recover all its damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach.[25] While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural.[26]

(b) Damages Limited to 2-Year Period
Aon assigns error to the district court's determination that evidence regarding damages allegedly incurred more than 2 years after Pearson's breach of the nonsolicitation agreement would be speculative and irrelevant and, therefore, inadmissible. In response to this ruling, Aon made an offer of proof establishing that Aon has retained 95 percent of its customers each year since 2001 and that the losses caused by Pearson's breach could be expected to occur at least through the year 2005. The district court again ruled that evidence of damages beyond the 2-year period was speculative and inadmissible. *640 It sustained Pearson's objection to an offer of evidence showing Aon's claimed lost profits in the years 2004 to 2006.
A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[27] Pearson would have been free to solicit business from Aon customers after the 2-year restricted period, and there is evidence in the record that customers can change brokers whenever they choose to do so, without prior notice. We conclude that the district court did not abuse its discretion in holding that evidence of lost profits beyond the 2-year period was speculative and, therefore, irrelevant and inadmissible.

(c) Testimony of Dennis R. Hein
Dennis R. Hein is a certified public accountant who testified as an expert witness on behalf of Aon. Pearson assigns error by the district court in overruling his motion in limine and receiving, over Pearson's foundational objections, Hein's opinions with regard to lost profits.
Hein testified that he reviewed Aon's financial documents for the years 2000 to 2002. He attempted to determine what revenues were taken away by Pearson during 2002 and 2003 and what effect expenses had on those revenues. In calculating expenses, he focused on those that he opined would vary directly with the production of business, including items such as entertainment, lodging, travel, public relations, postage, office supplies, and printing. He found that Aon's average expense ratio for these variable items in the years 2000 to 2002 was 3.72 percent of its revenues. To be conservative, he rounded this figure up to 6 percent.
To calculate the revenue lost when the Aon customers followed Pearson to Midlands, Hein looked at Aon's average growth rate of 4.76 percent in the years 2000 to 2002. He rounded that number down to 4 percent, and then multiplied the total revenues generated to Aon in 2001 by the customers Pearson took to Midlands by that percentage. After determining this sum, he subtracted 6 percent to represent the additional expenses Aon would have incurred in generating the revenue. His calculation resulted in a net lost profit to Aon in 2002 of $199,683. Hein conducted a similar analysis for 2003 and determined that the 2003 lost profits were $207,671. Hein's opinions with respect to lost profits were based upon a reasonable degree of professional certainty as a certified public accountant.
On cross-examination, Hein testified that in performing his calculations, he considered all of Aon's actual expenses. He essentially stated that Aon's fixed costs would have remained the same with respect to the additional revenue, because Aon had employees capable of handling the increased revenue volume. Thus, Hein reasoned that the only additional expenses Aon would have incurred in generating the income were those that he identified as accounting for 6 percent of the revenue generated.
Pearson argues that the trial court failed to properly perform its "gatekeeper" function and that Hein's methodology was suspect because he failed to include all relevant expenses. We held in City of Lincoln v. Realty Trust Group[28] that not every attack on expert testimony amounts *641 to a claim under Daubert v. Merrell Dow Pharmaceuticals, Inc.,[29] and Schafersman v. Agland Coop.[30] Pearson's motion in limine and objections during trial did not raise a Daubert/Schafersman issue. What Pearson really is asserting is an attack on the factual basis of the opinion, a criticism that goes to its weight, not its admissibility. The admission of expert testimony is ordinarily within the trial court's discretion, and its ruling will be upheld absent an abuse of discretion.[31] We conclude that the district court did not err in receiving Hein's opinions regarding damages over Pearson's objections.

(d) Calculation of Damage Award
Both Pearson and Aon assign error to the district court's determination that Aon sustained damages in the amount of $123,063. Additional portions of the record bear on our review of this issue.
To rebut Hein's testimony, Pearson offered the expert testimony of David C. Riley, also a certified public accountant. Riley disagreed with Hein's methodology and opined that the proper method of calculating damages was to consider Aon's percentage increase in expenses during the years 2000 to 2002. According to Riley, Hein did not follow generally accepted principles of accounting and failed to properly calculate Aon's lost profits. Riley calculated that in the years 2001 to 2003, Aon had an average net profit percent of 6.57 percent. When he applied that percentage to the revenues lost by Aon, he determined that Aon's lost profits "attributable to" Pearson were $28,457.
Pearson testified at trial that no more than 80 percent of the revenue he generated for Midlands in 2002 and 2003 came from former Aon customers. He had earlier testified in his deposition that approximately 75 percent of the revenue came from Aon customers. Evidence was received, without objection, detailing the amount of compensation Pearson received from Midlands in the years 2001 to 2003. An exhibit was received without objection which purported to show the revenue generated by Pearson for Midlands with respect to the customers Pearson had formerly serviced at Aon.
In its order of judgment, the district court found that the "best evidence" of revenues actually lost to Aon due to Pearson's actions was Pearson's "testimony relative to his commissions while at Midlands." The court therefore "reject[ed] opinions of the experts of the parties as to projected lost revenues and/or profits." However, the court expressly accepted Hein's opinion that Aon would have incurred additional expenses servicing the customers and that those expenses would equal 6 percent of the gross revenues generated by Pearson. The court also specifically found that as of January 1, 2002, Aon had sufficient personnel to service the customers that Pearson took to Midlands.
The district court then calculated lost profits in a manner that differed from either method used by the parties' experts. The court first determined the actual revenues lost to Aon. It reached this sum by multiplying Pearson's actual compensation for the years 2002 and 2003 by 2, based on the undisputed evidence that Pearson was paid 50 percent of all revenues he generated. *642 Then, the court multiplied this sum by 80 percent, based on Pearson's testimony that approximately 80 percent of the revenue he generated at Midlands came from former Aon customers.
The court then multiplied the revenues lost by 6 percent to determine what additional expenses would have been incurred in generating those revenues. Once these numbers were determined, the court (1) added the additional revenues into the actual operating revenues for Aon for the year in question, (2) added the additional expenses into the actual expenses incurred by Aon for the year in question, and (3) determined what the profit/expense ratio was for the year in question. After determining this ratio, the court applied it to the additional revenues generated by Pearson and arrived at a lost profit figure of $53,958 for 2002 and a figure of $92,141 for 2003. Because the nonsolicitation agreement would have expired in September 2003, the court reduced the 2003 amount by 25 percent and concluded that Aon's total lost profits were $123,063.
Both Aon and Pearson assert that the trial court erred in its calculations. Pearson argues that Hein's 6-percent variable expense estimate was not based on the evidence, and Aon contends that the court erred in accessing the 6-percent variable twice. We conclude that neither is correct. There is evidence in the record to support Hein's conclusion that Aon would only have incurred an additional 6 percent in "variable" expenses in generating the additional revenue. Hein gave a reasoned basis for his calculations, and the district court explicitly found that Aon had personnel in place to service the additional revenue so that no allocation needed to be made for items such as salary and benefits. Based upon our review of the record, we find no merit in Pearson's argument that the district court improperly calculated expenses in arriving at its finding of lost net profits.
There is no precise formula for determining lost profits, and the only requirement in Nebraska is that the calculation be supported by some financial data which would permit an estimate of the actual loss to be made with reasonable certitude and exactness.[32] We conclude that the record is sufficient to support the method of calculating damages utilized by the district court.

3. BREACH OF FIDUCIARY DUTY CLAIM
In its cross-appeal in case No. 07-034, Aon assigns and argues that the district court erred in granting summary judgment in favor of Pearson on Aon's claim that Pearson breached his fiduciary duty as an officer of Aon and in dismissing that claim. Aon contends that Pearson breached fiduciary duties of good faith and loyalty because he failed to alert Aon to Dorenbach's plans to leave her employment with Aon and solicit some of its customers on behalf of Midlands. In Aon's second amended petition, it alleged that Pearson planned both his and Dorenbach's departure from Aon "in such a manner so as to solicit and divert customers of [Aon] prior to their termination from employment." The record is clear that these alleged breaches could not have occurred any earlier than June 2001, as that is the date that Pearson and Dorenbach first discussed leaving their positions at Aon. The district court did not disclose its reasons for granting Pearson's motion for summary judgment on this issue.
Aon's brief relies exclusively on Nebraska law. In Nebraska, an officer must comply with all applicable fiduciary *643 duties when dealing with the corporation and its shareholders.[33] Nominal corporate officers, with no management authority, generally do not owe fiduciary duties to the corporation.[34] However, "an officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law."[35]
Pearson became a vice president of A & A in 1990 and assumed management duties at that time, which included management of the company's Lincoln office and later the Omaha office as well. His duties included supervising sales personnel, developing budgets, and hiring and firing employees. After the merger of A & A and Aon in 1997, Pearson was designated as a vice president of Aon by the company's board of directors. He initially performed the same management duties for Aon. In March 2001, Aon relieved Pearson of all managerial duties, but he retained the title of vice president.
The alleged breaches of Pearson's fiduciary duty all occurred after March 2001. Thus, assuming that he owed fiduciary duties to Aon at the time he exercised managerial discretion, the issue before us is whether his fiduciary obligation continued when his managerial duties ceased. Restated, the question is, Was Pearson a fiduciary when he retained the title of a corporate officer but no longer exercised discretionary management authority?
There is little legal authority on this issue. One court has adopted the general rule that once a fiduciary duty exists, it does not cease when managerial duties cease, noting "[e]ven when an officer loses power or authority, that officer still owes a fiduciary duty to the corporation. To divest himself or herself of the duty, the officer must resign the office."[36] We find this rule unpersuasive for two reasons. First, the authority cited in support of this rule does not involve corporate officers and is distinguishable from the instant case.[37] Second, the stated ration ale for the rule is the agency principle of apparent authority, a principle that is not at issue in the instant case.[38]
We are more persuaded by decisions from other jurisdictions holding that the existence of a fiduciary duty of an officer in a closely held corporation "depends on the ability to exercise the status which creates it."[39] These courts conclude that *644 when a corporate officer loses managerial responsibilities, the corresponding fiduciary duty ceases to exist.[40] Although Aon is not a closely held corporation, we find that this rule is applicable to the facts of the instant case and is consistent with § 21-2099. Pearson exercised low-level, local management authority in a large corporation. This authority was taken away from him in March 2001, and at that point, he was simply one of hundreds of Aon vice presidents. At the time of Pearson's alleged breach, he had no involvement in the management and operation of the corporation beyond his own production. We conclude that Pearson owed no fiduciary duty to Aon at the time the alleged breach of the duty occurred, and thus the district court properly granted summary judgment in his favor on this claim.

4. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
In case No. S-06-1256, Aon contends that the district court erred in directing a verdict in favor of Midlands on Aon's claim that Midlands tortiously interfered with its contract with Pearson. To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.[41]
We have concluded that the nonsolicitation agreement between Aon and Pearson was valid and enforceable, and there is no dispute that representatives of Midlands were made aware of the agreement prior to hiring Pearson in September 2001. By January 2002 at the latest, Midlands knew that Pearson was soliciting business on its behalf from customers he had served while employed by Aon. The key issue is whether the district court erred in determining that there was no evidence to support a finding that Midlands' hiring and continued employment of Pearson with such knowledge constituted an "unjustified intentional act of interference."
Factors to consider in determining whether interference with a business relationship is "improper" include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.[42]
"The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced *645 in arriving at a judgment; but it does not exhaust the list of possible factors."[43]
In this case, it is clear that Pearson contacted Midlands about employment and that Midlands neither solicited nor recruited Pearson. Pearson informed Midlands of the nonsolicitation agreement, but at the same time, he told Midlands that his attorney had given him an opinion that the agreement was unenforceable. It is undisputed that Midlands did not expect or require Pearson to solicit customers he had served while employed by Aon and that he likely could have met the Midlands' production expectations without doing so. From this record, the most that can be said is that Midlands hired an experienced individual who sought employment and relied in good faith upon his representation that, according to his attorney, his nonsolicitation agreement with a prior employer was unenforceable. In order to be actionable, interference with a business relationship must be both intentional and unjustified.[44] Based upon our review of the record, we conclude that the district court did not err in determining that Aon presented no evidence to support a reasonable inference that Midlands intentionally and unjustifiably interfered with its contractual relationship with Pearson.

V. CONCLUSION
For the reasons discussed, we affirm the judgment of dismissal in case No. S-06-1256. In case No. S-07-034, we affirm the award of damages in favor of Aon and affirm the partial summary judgment in favor of Pearson.
AFFIRMED.
NOTES
[1] See Neb.Rev.Stat. § 24-1106(3) (Reissue 1995).
[2] Erickson v. U-Haul Intern., 274 Neb. 236, 738 N.W.2d 453 (2007); Glad Tidings v. Nebraska Dist. Council, 273 Neb. 960, 734 N.W.2d 731 (2007).
[3] Sayah v. Metropolitan Prop. & Cas. Ins. Co., 273 Neb. 744, 733 N.W.2d 192 (2007).
[4] Magistro v. J. Lou, Inc., 270 Neb. 438, 703 N.W.2d 887 (2005); Par 3, Inc. v. Livingston, 268 Neb. 636, 686 N.W.2d 369 (2004).
[5] Poppe v. Siefker, 274 Neb. 1, 735 N.W.2d 784 (2007); Orduna v. Total Constr. Servs., 271 Neb. 557, 713 N.W.2d 471 (2006).
[6] Bellino v. McGrath North, 274 Neb. 130, 738 N.W.2d 434 (2007); LeRette v. American Med. Security, 270 Neb. 545, 705 N.W.2d 41 (2005).
[7] Jackson v. Brotherhood's Relief & Comp. Fund, 273 Neb. 1013, 734 N.W.2d 739 (2007); Billingsley v. BFM Liquor Mgmt., 264 Neb. 56, 645 N.W.2d 791 (2002).
[8] Id.
[9] See Neb.Rev.Stat. §§ 25-12,101 to 25-12,107 (Reissue 1995).
[10] See Md. Code Ann., Corps. & Assns. § 3-114(e) (LexisNexis 2007).
[11] See Md. Code Ann., Corps. & Assns. § 1401(d) (LexisNexis 2007).
[12] UARCO Inc. v. Lam, 18 F.Supp.2d 1116 (D.Haw.1998); Corporate Exp. Office Products v. Phillips, 847 So.2d 406 (Fla.2003); Alexander & Alexander, Inc. v. Koelz, 722 S.W.2d 311 (Mo.App.1986).
[13] UARCO Inc. v. Lam, supra note 12, 18 F.Supp.2d at 1122.
[14] Corporate Exp. Office Products v. Phillips, supra note 12, 847 So.2d at 413.
[15] Id. at 414.
[16] Alexander & Alexander, Inc. v. Koelz, supra note 12, See, also, Equifax Services, Inc. v. Hitz, 905 F.2d 1355, 1361 (10th Cir.1990) (holding that after merger, surviving corporation "automatically succeeds to the rights of the merged corporations to enforce employees' covenants not to compete").
[17] Smith, Bell & Hauck v. Cullins, 123 Vt. 96, 183 A.2d 528 (1962).
[18] Id. at 100, 183 A.2d at 531, citing Vt. Stat. Ann. tit 11, §§ 161 and 165 (1958).
[19] Mertz v. Pharmacists Mut. Ins. Co., 261 Neb. 704, 625 N.W.2d 197 (2001).
[20] Professional Bus. Servs. v. Rosno, 256 Neb. 217, 589 N.W.2d 826 (1999); Moore v. Eggers Consulting Co., 252 Neb. 396, 562 N.W.2d 534 (1997).
[21] See, id.; Boisen v. Petersen Flying Serv., 222 Neb. 239, 383 N.W.2d 29 (1986).
[22] Id.
[23] Schuelke v. Wilson, 255 Neb. 726, 587 N.W.2d 369 (1998).
[24] Nebraska Nutrients v. Shepherd, 261 Neb. 723, 626 N.W.2d 472 (2001); Ruble v. Reich, 259 Neb. 658, 611 N.W.2d 844 (2000).
[25] Nebraska Nutrients v. Shepherd, supra note 24; Gagne v. Severa, 259 Neb. 884, 612 N.W.2d 500 (2000).
[26] J.D. Warehouse v. Lutz & Co., 263 Neb. 189, 639 N.W.2d 88 (2002); Home Pride Foods v. Johnson, 262 Neb. 701, 634 N.W.2d 774 (2001).
[27] Karel v. Nebraska Health Sys., 274 Neb. 175, 738 N.W.2d 831 (2007); Green Tree Fin. Servicing v. Sutton, 264 Neb. 533, 650 N.W.2d 228 (2002).
[28] City of Lincoln v. Realty Trust Group, 270 Neb. 587, 705 N.W.2d 432 (2005).
[29] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[30] Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001).
[31] In re Trust of Rosenberg, 273 Neb. 59, 727 N.W.2d 430 (2007); Ford v. Estate of Clinton, 265 Neb. 285, 656 N.W.2d 606 (2003).
[32] See Home Pride Foods Inc. v. Johnson, supra note 26.
[33] See, Trieweiler v. Sears, 268 Neb. 952, 689 N.W.2d 807 (2004); Anderson v. Bellino, 265 Neb. 577, 658 N.W.2d 645 (2003).
[34] 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 837.50 (perm. ed., rev. vol. 2002 & Cum. Supp. 2007). See Neb.Rev.Stat. § 21-2099 (Reissue 1997). See, also, GAB v. Lindsey & Newsom Claim Services, 83 Cal.App.4th 409, 99 Cal.Rptr.2d 665 (2000), disapproved on other grounds, Reeves v. Hanlon, 33 Cal.4th 1140, 95 P.3d 513, 17 Cal.Rptr.3d 289 (2004).
[35] GAB v. Lindsey & Newsom Claim Services, supra note 34, 83 Cal.App.4th at 420-21, 99 Cal.Rptr.2d at 672. See, § 21-2099; 3 Fletcher, supra note 34.
[36] GAB v. Lindsey & Newsom Claim Services, supra note 34, 83 Cal.App.4th at 421, 99 Cal. Rptr.2d at 673.
[37] Rader v. Thrasher, 57 Cal.2d 244, 368 P.2d 360, 18 Cal.Rptr. 736 (1962) (referencing duties owed by attorney to client after client expresses disapproval of attorney's actions); Vai v. Bank of America, 56 Cal.2d 329, 364 P.2d 247, 15 Cal.Rptr. 71 (1961) (holding spouses owe reciprocal fiduciary duties with respect to undivided community property); Sime v. Malouf, 95 Cal.App.2d 82, 212 P.2d 946 (1949) (holding cojoint venturers owed each other fiduciary duties).
[38] See GAB v. Lindsey & Newsom Claim Services, supra note 34.
[39] J Bar H, Inc. v. Johnson, 822 P.2d 849, 861 (Wyo.1991) (emphasis omitted). See Voss Engineering v. Voss Industries, 134 Ill.App.3d 632, 481 N.E.2d 63, 89 Ill.Dec. 711 (1985).
[40] Id.
[41] See, Macke v. Pierce, 266 Neb. 9, 661 N.W.2d 313 (2003), citing Huff v. Swartz, 258 Neb. 820, 606 N.W.2d 461 (2000).
[42] Macke v. Pierce, supra note 41.
[43] Huff v. Swartz, supra note 41, 258 Neb. at 829, 606 N.W.2d at 468, quoting Restatement (Second) of Torts § 767, comment b. (1979).
[44] See Huff v. Swartz, supra note 41.