CHRISTOPHER C. HUFF, APPELLANT, V.
RAYMOND SWARTZ, APPELLEE.
606 N.W. 2d 461

Filed February 18, 2000.    No. S-97-1045.

■

Michael P. Dowd, of Dowd & Dowd, for appellant.

Robert F. Rossiter, Jr., of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Christopher C. Huff brought this civil action for damages against Raymond Swartz, alleging tortious interference with a business relationship. The district court for Douglas County, Nebraska, granted Swartz' motion for summary judgment, and Huff appealed. In an unpublished opinion, the Nebraska Court of Appeals determined that there were genuine issues of material fact which precluded summary judgment, and reversed and remanded for further proceedings. See *Huff v. Swartz*, No. A-97-1045, 1999 WL 247123 (Neb. App. Apr. 13, 1999) (not designated for permanent publication). We granted Swartz' petition for further review, and we conclude that the district court did not err in entering summary judgment in favor of Swartz.

## I. FACTS

The following facts are reflected in the pleadings, depositions, affidavits, and discovery responses which comprise the record: Huff was employed by AT&T, now known as Lucent Technologies, for 29 years. Until March 1994, Huff was employed at an AT&T plant in Shreveport, Louisiana. At that time, Huff requested and was granted a transfer to an AT&T plant in Omaha, Nebraska. Huff requested the transfer because downsizing at the Shreveport plant was likely to affect his wife, who was an hourly-wage employee there. In conjunction with his application for transfer, Huff forwarded letters of recommendation from his previous AT&T supervisors in Shreveport, including Thomas Toms, Don Scriber, and Richard Lutz, to AT&T executives in Omaha.

At all material times, Swartz was employed by AT&T as the manager for engineering and operations at its Omaha plant. He was considered to be a third-level manager. His duties included supervising approximately 1,000 people, roughly one-third of the plant's work force. Swartz had authority to hire and terminate employees within company guidelines.

Three months after transferring to the Omaha plant, Huff was assigned to a first-level managerial position of directly supervising the second-shift cabinet production line. After Huff began this job, Swartz came to the shop floor and asked him how the work was progressing. At that time, Huff informed Swartz that only 10 of the 45 cabinet types which the plant was producing were listed in the departmental computer, representing only about 2 to 3 percent of the total output. Huff expressed concern that this partial production data was the basis for the department's production efficiency rating of 85 percent. Huff informed Swartz that he would not post any additional information until the misleading information was corrected. Swartz responded by nodding. According to Huff, this was one of the few contacts he had with Swartz prior to August 18, 1994, and none of these contacts resulted in any problems between him and Swartz.

Huff's direct supervisor at the Omaha plant was Steve Condra. Condra, in turn, reported to Swartz. In late July or early August 1994, Condra voiced concerns to Swartz about Huff's job performance. After learning of these concerns, Swartz contacted Penney Bromell of the human resources department at AT&T's Shreveport plant and inquired about Huff's job performance during his employment there. Swartz described to Bromell Huff's performance deficiencies as reported to him by Condra and asked Bromell if similar problems had been noted while Huff had worked at the Shreveport plant. Bromell gave an affirmative response and told Swartz that Huff had been reassigned from the production floor to a nonsupervisory position.

After speaking to Swartz, Bromell contacted Alex Vukovich, who was in charge of human resources and public relations for the AT&T plants in Shreveport and Denver, Colorado. Vukovich then spoke with Swartz. During this conversation, Swartz questioned why the letters of recommendation sent on behalf of Huff were "glowing" when the Omaha plant was experiencing prob-

lems with his performance. Vukovich questioned those who wrote the letters and was told that the letters were based upon Huff's performance in a nonsupervisory position. According to Vukovich, Swartz did not direct him to review the letters. The individuals who had written the letters denied that they were asked to rewrite them or that they felt threatened to do so.

Bromell stated that during one of several conversations she had with Swartz, he stated that the Shreveport plant was obligated to take Huff back because of the misleading letters of recommendation. Swartz also told her that he would be the person in Omaha responsible for deciding if future transfers from Shreveport would be allowed and that Shreveport's refusal to take Huff back would be a factor in considering future transfers. Swartz denied telling Bromell that if Huff was not returned to Shreveport there would be no future transfers. According to Vukovich, if Swartz made such a statement to Bromell, he would be acting beyond the scope of his authority. Vukovich also stated that the Omaha plant had no authority to dictate labor relations in Shreveport.

On August 17, 1994, Condra again approached Swartz and stated that he felt Huff's job performance was detrimental to the cabinet production line and wanted to make a change. On August 18, Condra called Huff and asked him to come to Swartz' office. Both Condra and Swartz were in the office when Huff arrived. Huff testified that after he greeted the two men, Swartz asked Huff in a loud voice, "What in the hell do you think you're doing down on that shop floor . . . ." When Huff requested some explanation, Swartz replied that Condra had reported having Huff in his office on several occasions. Huff responded that this was a lie and explained that his two prior contacts with Condra involved issues that had been resolved. Huff testified that on two separate occasions during this meeting, Swartz stated: "I'm going to do whatever it takes to bust you, fire you, demote you or send you back to Shreveport." At the conclusion of the meeting, Swartz removed Huff from the cabinet production line and assigned him to a nonsupervisory job at the same pay level.

Huff performed his new tasks for approximately 3 days. He then sought medical treatment from a physician, who diagnosed

and began treating Huff for depression. Huff never returned to work in Omaha and sought further medical treatment for his depression. His subsequent treating physician opined that he sustained major depression and posttraumatic stress disorder due to his problems at work. Huff was eventually transferred back to Shreveport, but retired for medical reasons.

Huff filed this action on January 29, 1996. In his operative second amended petition, Huff alleged that Swartz tortiously interfered with his business relationship with AT&T. Specifically, Huff alleged that Swartz contacted Huff's former supervisors in Shreveport and demanded that his employment background be investigated, that Swartz directed that Huff's letters of recommendation be altered, and that Swartz effectuated Huff's transfer back to Shreveport by threatening to bar all future transfers unless Huff's transfer was made. Huff alleged that such conduct forced him to incur emotional distress and anguish.

On September 17, 1997, the district court for Douglas County granted Swartz' motion for summary judgment. The court found that Swartz' actions were within the scope of his employment and that there was no evidence that he acted maliciously or that he profited by his conduct. In reversing this judgment, the Court of Appeals determined that a genuine issue of material fact existed because there was evidence that Swartz used a threatening tactic to get Shreveport to accept Huff back and that such action was outside the scope of Swartz' authority. *Huff v. Swartz*, No. A-97-1045, 1999 WL 247123 (Neb. App. Apr. 13, 1999) (not designated for permanent publication). The court also found, as an independent basis for reversing the order of summary judgment, that there was a genuine issue of material fact regarding whether Swartz' actions were malicious. We granted Swartz' petition for further review.

## II. ASSIGNMENT OF ERROR

Swartz contends in his petition for further review, restated and summarized, that the Court of Appeals failed to properly analyze the claim of tortious interference with a business relationship in the context of at-will employment.

## III. STANDARD OF REVIEW

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Parnell v. Madonna Rehab. Hosp., ante* p. 125, 602 N.W.2d 461 (1999); *Ferguson v. Union Pacific RR. Co., ante* p. 78, 601 N.W.2d 907 (1999).

In reviewing an order granting a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party opposing the motion and gives that party the benefit of all reasonable inferences deducible from the evidence. *Ferguson v. Union Pacific RR. Co., supra.*

## IV. ANALYSIS

### 1. EXISTENCE OF CAUSE OF ACTION

The elements of tortious interference with a business relationship or expectation are

"(1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted."

*Koster v. P & P Enters.*, 248 Neb. 759, 764, 539 N.W.2d 274, 278-79 (1995). Because Huff did not allege the existence of a contract applicable to his employment with AT&T, it must be inferred that he was an at-will employee. See, *Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991); *White v. Ardan, Inc.*, 230 Neb. 11, 430 N.W.2d 27 (1988). This court has never decided whether a cause of action for tortious interference with a business relationship may be brought by an at-will employee against a coemployee. The issue was presented in *Matheson v. Stork*, 239 Neb. at 552, 477 N.W.2d at 160, wherein we stated that "[a]ssuming, but not deciding, that there can ever be a tortious interference with such an employment relationship, and assuming further, but again not deciding, that another employee

acting outside his or her employment authority may under any circumstances tortiously interfere with such a relationship," no actionable claim was stated because there were no allegations of harm or damage resulting from the alleged interference.

Subsequently, in *Hoschler v. Kozlik*, 3 Neb. App. 677, 529 N.W.2d 822 (1995), the Court of Appeals determined that an at-will employee had stated a cause of action against her former supervisor for intentional interference with a business relationship. That holding provided the framework for the judgment reached by the Court of Appeals in the present case. Our disposition on further review therefore requires that we specifically resolve the two issues of law identified but not decided in *Matheson v. Stork, supra.*

(a) Is At-Will Employment "Business
Relationship or Expectancy" Which May Be
Object of Tortious Interference?

In *Hoschler*, the Court of Appeals correctly noted that to be actionable as tortious interference with a business relationship, the interference must necessarily impact on a valid business relationship or expectancy. Unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason. *Walpus v. Milwaukee Elec. Tool Corp.*, 248 Neb. 145, 532 N.W.2d 316 (1995); *Hamersky v. Nicholson Supply Co.*, 246 Neb. 156, 517 N.W.2d 382 (1994). Relying upon the holdings of a majority of courts which have addressed the issue, as well as Restatement (Second) of Torts § 766 (1979), the Court of Appeals in *Hoschler* held that "at-will employment status, in and of itself, does not preclude a claim for tortious interference" with the employment relationship. 3 Neb. App. at 682, 529 N.W.2d at 826. The court reasoned that the fact that at-will employment "may be terminated by the parties without liability does not necessarily privilege another individual, business, or entity, in other words, a 'third person,' to unjustifiably induce the termination." *Id.* We agree with and adopt this holding and the rationale upon which it is based.

## (b) Under What Circumstances Can Coemployee Commit Actionable "Unjustified Intentional Act of Interference" With At-Will Employment Relationship?

In *Hoschler*, the Court of Appeals determined that the third element of the cause of action for tortious interference with a business relationship or expectation required an examination of "what is sufficient to constitute an 'unjustified' interference." 3 Neb. App. at 682, 529 N.W.2d at 826. While we agree with this statement, we conclude that it is first necessary to determine what constitutes "interference" with an at-will employment relationship by a supervisor or other coemployee; in other words, at what point does the coemployee become a "third person" subject to liability for tortious interference with the at-will employment relationship of another on the basis of an "unjustified intentional act"?

In addressing this issue, other courts have drawn a distinction between actions which fall within the general scope of the alleged interferer's authority as an agent of the employer and those which are in furtherance of some individual or private purpose not related to the interests of the employer. For example, in *Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 505-06 (Minn. 1991), an opinion cited by the Court of Appeals in *Hoschler v. Kozlik*, 3 Neb. App. 677, 529 N.W.2d 822 (1995), the court stated:

> The general rule is that a party cannot interfere with its own contract. [Citation omitted.] If a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort. To allow the officer or agent to be sued and to be personally liable would chill corporate personnel from performing their duties and would be contrary to the limited liability accorded incorporation.

Similarly, under Alabama law, " '[s]o long as the officer or employe [sic] acts within the general range of his authority intending to benefit the corporation, the law identifies his actions with the corporation.' " *Hickman v. Winston County Hosp. Bd.*, 508 So. 2d 237, 239 (Ala. 1987), quoting *Wampler v.*

*Palmerton*, 250 Or. 65, 439 P.2d 601 (1968). And in *Wilcox v. Niagara of Wisconsin Paper Corp.*, 965 F.2d 355, 365 (7th Cir. 1992), the court found that in order to constitute interference with an employment relationship under Wisconsin law, it was necessary to show that the employee was serving a master other than the employer or was pursuing "some benefit to himself, at odds with the interests" of the employer. We agree with these authorities and hold that in order to constitute actionable interference with an employment relationship, actions of a coemployee must be shown to have been committed in furtherance of some purpose other than the lawful purposes of the employer. If such interference is established, it must also be proved to be "unjustified" in order to be actionable. *Koster v. P & P Enters.*, 248 Neb. 759, 539 N.W.2d 274 (1995); *Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991).

■ Restatement (Second) of Torts § 766 at 7 (1979) describes a cause of action similar to that which we have recognized for intentional interference with a business relationship or expectancy, imposing liability upon one who "intentionally and improperly interferes" with the performance of a contract. The Restatement, *supra*, § 767 at 26-27, lists seven factors to consider in determining whether interference with a business relationship is "improper":

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

In the introductory note to the Restatement, *supra*, ch. 37 at 7, that authority states that in making its analysis, the factfinder is to engage in a balancing process, noting: "The determination of whether an interference is improper depends upon a comparative appraisal of these factors. And the decision is, whether it was improper under the circumstances—that is under the partic-

ular facts of the individual case, not in terms of rules of law or generalizations." Furthermore, the Restatement, *supra*, § 767, *comment b.* at 28, notes:

> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.

In *Hoschler v. Kozlik*, 3 Neb. App. 677, 529 N.W.2d 822 (1995), the Court of Appeals concluded that the factors recited by the Restatement for determining whether interference is "improper" should be used to determine whether interference is "unjustified" under our law. We agree with and adopt this conclusion.

We respectfully disagree, however, with the statement of the Court of Appeals in *Hoschler* that

> the intentional interference by a fellow employee, including an officer, director, or other employee, in the employment relationship of another employee with a common employer, when it is malicious and thus unjustified or is outside the scope of authority of the interfering employee, gives rise to a cause of action for tortious interference.

*Hoschler v. Kozlik*, 3 Neb. App. at 686, 529 N.W.2d at 828. As noted above, a showing that a coemployee acts in furtherance of interests other than those of the employer provides proof of interference but does not necessarily establish *unjustified* interference, as this statement suggests. Moreover, the court's equation of "malicious" with "unjustified" is inconsistent with its prior correct statement that malice is not an element of tortious interference with a business relationship. While a malicious motive is a factor which may be considered in determining whether interference is unjustified, and may indeed weigh heavily toward such a finding, it is generally insufficient standing alone to establish that fact under the seven-factor balancing test of the Restatement (Second) of Torts § 767 (1979) discussed

above. To hold otherwise would be inconsistent with the fact that Nebraska law does not recognize a cause of action for malicious termination of at-will employment. *White v. Ardan, Inc.*, 230 Neb. 11, 430 N.W.2d 27 (1988).

## 2. APPLICATION OF LAW TO FACTS

Huff's transfer from Shreveport to Omaha was effective March 21, 1994. Huff testified that prior to being summoned to the meeting in Swartz' office in August of that year, he had experienced no problems with Swartz. There is no evidence in the record which would support an inference that this meeting, or the statements made by Swartz during the meeting, were motivated by anything other than perceived shortcomings in Huff's job performance which had been reported to Swartz by Condra, Huff's immediate supervisor who was also present during the meeting. Thus, while the tone and substance of Swartz' statements during the meeting as recounted by Huff could lead to an inference that Swartz spoke and acted boorishly, there is no evidence that Swartz did so in any capacity other than as an AT&T manager addressing a job performance issue involving a subordinate employee. Thus, because Swartz made the statements in his capacity as an agent of Huff's employer, they are not the statements of a "third party" to the employment relationship and cannot constitute "interference" with that relationship.

Likewise, there is nothing in the record which would permit an inference that Swartz' contacts with persons at the Shreveport facility where Huff had previously worked were made on behalf of anyone other than AT&T. The contacts pertained to Huff's job performance in Shreveport as it related to his perceived performance deficiencies in Omaha. Even if we assume the truth of the disputed allegation that Swartz requested that favorable letters of recommendation be rewritten after learning of a problem with Huff's performance while in a supervisory capacity in Shreveport, there is no evidence that he acted in furtherance of any purposes other than those of AT&T.

As the manager of the Omaha facility, Swartz had authority to discuss employee transfers to other AT&T facilities with

other AT&T employees. When asked at his deposition if he disputed that Swartz had authority to transfer him to a position where he felt he was better suited, Huff replied, "He is the boss. He can do what he wanted." Even assuming the truth of the disputed evidence that Swartz threatened to block future transfers from Shreveport to Omaha if Shreveport officials did not agree to accept Huff's transfer back to that facility, there is no evidence that Swartz pursued the topic of transferring Huff for any reason other than perceived deficiencies in Huff's job performance at the Omaha facility. Whether or not his perception was correct, Swartz had authority by virtue of his supervisory position with AT&T to deal with the issue of Huff's job performance, and even if he threatened to take action regarding future transfers from Shreveport, which would have exceeded his authority, there is no evidence that he did so for any purpose unrelated to his managerial responsibilities with AT&T.

The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Nebraska Popcorn v. Wing, ante* p. 60, 602 N.W.2d 18 (1999); *Knudsen v. Mutual of Omaha Ins. Co.*, 257 Neb. 912, 601 N.W.2d 725 (1999). After the movant makes a prima facie case for summary judgment, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. *Nebraska Popcorn v. Wing, supra.* If uncontroverted, the evidence adduced by Swartz in support of his motion for summary judgment would entitle him to judgment as a matter of law. Huff failed to produce any evidence upon which a reasonable inference could be drawn that the actions of Swartz of which Huff complains were not taken on behalf of AT&T and, therefore, presented no proof of "interference" with his employment relationship with that entity.

## V. CONCLUSION

To summarize, we hold that an at-will employment relationship can be the subject of a tort action for intentional interference with a business relationship or expectancy and that such an action may be maintained against a coemployee who acts as a

third party to the relationship by taking actions for his or her own personal benefit, or for the benefit of an entity other than the employer. In the present case, there is no evidence that any actions taken by Swartz affecting Huff's employment with AT&T were taken on behalf of any entity other than AT&T, and thus as a matter of law, it cannot be said that Swartz interfered with Huff's employment relationship, whether with justification or otherwise. Therefore, upon further review, we reverse the judgment of the Court of Appeals and remand the cause with directions to reinstate the judgment of the district court.

REVERSED AND REMANDED WITH DIRECTIONS.