Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/15/2020 08:07 AM CST

- 243 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

SUMMIT RESTORATION, INC., APPELLANT
AND CROSS-APPELLEE, V. LARRY G.
KELLER ET AL., APPELLEES
AND CROSS-APPELLANTS.
___ N.W.2d ___

Filed December 8, 2020.    No. A-19-1111.

1. **Judgments: Verdicts: Directed Verdict.** A motion for judgment notwithstanding the verdict may be granted when the movant's previous motion for directed verdict, made at the conclusion of all the evidence, should have been sustained.

2. **Judgments: Verdicts.** To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion.

3. ____: ____. On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted that is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence.

4. **Judgments: Verdicts: Appeal and Error.** Review of a ruling on a motion for judgment notwithstanding the verdict is de novo on the record.

5. **Torts: Intent: Proof.** To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

6. **Torts: Employer and Employee.** Factors to consider in determining whether interference with a business relationship is improper include:

- 244 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

(1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

7. **Torts: Employer and Employee: Conspiracy: Liability: Proof.** In proving conspiracy to tortiously interfere with a business relationship, a claim of civil conspiracy is not actionable in itself, but serves to impose vicarious liability for the underlying tort of those who are a party to the conspiracy.

8. **Conspiracy: Liability.** By establishing a civil conspiracy, a plaintiff extends liability for the wrongful acts underlying the conspiracy to those actors who did not actively engage in the acts, but conspired in their commission.

9. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the case and controversy before it.

10. **Motions for New Trial: Appeal and Error.** An appellate court reviews a denial of a motion for new trial for an abuse of discretion.

11. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

12. **Damages: Evidence: Proof.** Damages, like any other element of the plaintiff's case, must be pled and proved, and the burden is on the plaintiff to offer evidence sufficient to prove the plaintiff's alleged damages.

13. **Damages: Proof.** A claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness.

Appeal from the District Court for Sarpy County: Michael A. Smith, Judge. Affirmed as modified.

Eric R. Chandler and Cory J. Rooney, of Law Office of Eric R. Chandler, P.C., L.L.O., for appellant.

Adam R. Feeney and Brian J. Brislen, of Lamson, Dugan & Murray, L.L.P., for appellee Larry G. Keller.

Jeffrey A. Nix, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellees Aspen Contracting, Inc., et al.

- 245 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

Pirtle, Chief Judge, and Moore and Riedmann, Judges.

Riedmann, Judge.

## INTRODUCTION

Summit Restoration, Inc. (Summit), appeals the order of the district court for Sarpy County which reduced the amount of a jury's damages award in Summit's favor. Larry G. Keller, Patrick M. Nussbeck, and Aspen Contracting, Inc., doing business as ASI Contracting, Inc. (Aspen), cross-appeal the denial of various posttrial motions. As explained below, we affirm as modified.

## BACKGROUND

Summit is a Colorado corporation with a headquarters in Sarpy County, Nebraska. It does business as a general contractor, including storm restoration work and roofing work. Aspen is a Kansas corporation doing business in Sarpy County and is a competitor of Summit, also doing work as a general contractor and performing roofing work. Nussbeck is the president and chief executive officer of Aspen. Keller began working for Summit in June 2013, and in June 2014, he left Summit to begin working for Aspen.

In February 2015, Summit filed a complaint against Keller, Nussbeck, Aspen, and another former Summit employee who was later dismissed as a defendant. An amended complaint was filed, and the causes of action alleged in the amended complaint that are relevant to this appeal include tortious interference with a business expectancy, civil conspiracy, and breach of fiduciary duty and duty of loyalty.

A jury trial was held over the course of several days in May 2019. The evidence revealed that Aaron Kantor, president of Summit, started the company in 2009. In June 2013, Kantor hired Keller as chief operating officer, but according to Kantor, shortly thereafter, Keller's title was changed to chief executive officer. There is a dispute among the parties as to whether Keller was actually the chief executive officer of Summit, but

- 246 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

it was uncontroverted that he ran the day-to-day operations of Summit, with testimony that he "ran the business." Keller was paid an annual salary of $120,000. Despite all of this, Keller never had a written employment contract with Summit, nor did he sign a confidentiality agreement, noncompetition agreement, or nonsolicitation agreement.

The Omaha, Nebraska, area experienced a major hailstorm on June 3, 2014. Keller and Summit's sales representatives made contact with homeowners who had suffered damage from the storm in an effort to obtain business for Summit. Keller explained that his practice while he was with Summit was to knock on doors and meet with the homeowner, do an inspection of the property, and then create an estimate report. He would try to meet the insurance adjuster, if possible, and then he would get a scope of work from the insurance company and compare it with his estimate. Once he knew what work was going to be done, he would talk to the homeowner and discuss what he or she wanted and then draft a contingency agreement. The purpose of doing an estimate prior to having a homeowner sign a contingency agreement with Summit was to gain the homeowner's confidence and build a relationship.

During this time, Keller began communicating with Nussbeck at Aspen. On June 13, 2014, Keller sent Nussbeck an email, informing him that Summit had "over [$]500,000 sold over the last week and seven inspections to do with five others to work up." Keller indicated that Summit had the potential for $5 to $8 million in sales that year. On June 16, Nussbeck responded to Keller with information detailing how general managers are compensated at Aspen because, according to Nussbeck, hiring Keller as a general manager "sounded like a good opportunity." Keller interpreted the June 16 email as a job offer and replied on June 20, asking if the offer was still "on the table." Keller met with Nussbeck on June 21 and finalized the details of his employment with Aspen by June 22. At the same time, several sales representatives who had been working with Summit also left and went to work with Aspen.

- 247 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

Keller's compensation at Aspen was 50 percent of the profits of the jobs he sold and 50 percent of the profits of the location that he managed.

The evidence at trial revealed that there were 17 homeowners Summit had contacted after the June 3, 2014, storm who ultimately had Aspen complete their repair work. All 17 of the jobs were insurance claim jobs, and according to Kantor, Summit had client relationships with all 17 homeowners. For these jobs, Summit anticipated earning a profit margin between 30 and 45 percent. Kantor acknowledged that Summit did not have written contingency agreements with all 17 homeowners and that Summit had not prepared estimates for all 17 of them. He explained, however, that even without a signed contingency agreement or estimate with these homeowners, Summit had performed work outside of just knocking on the door and meeting with the homeowner one time.

Keller admitted that after he left Summit and was hired by Aspen, he had additional contact with those 17 homeowners. He also acknowledged that he asked the other Summit representatives who converted to Aspen to talk to the customers with whom they had worked while at Summit. Kantor testified that Summit's database of customers was not a secret; however, it was not public knowledge either. Summit stored its customer files in an online storage system called Dropbox. Keller knew the names and addresses of the homeowners who had been contacted by Summit and that Summit's customer files were stored in Dropbox. Kantor testified that through Dropbox, he was able to "watch Summit jobs becoming Aspen jobs" after Keller left Summit because Keller did not log out of Summit's Dropbox account when he left. An employee of Summit also testified that she observed the movement of Summit's customer files in Keller's Dropbox on her computer after he left Summit and went to Aspen.

Adam Johnson testified as an expert witness for Summit. He testified that he owned a roofing company since 2013 and that approximately 95 percent of his company's work came from

- 248 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

residential insurance claims. He testified that in his experience, it would be "[v]ery rare" to have a situation where a customer signed a contingency agreement and then did not end up having that company complete the work. He said that when he has a signed contingency agreement from a customer, he "certainly expect[s]" to do the job.

Johnson also described software that is used for repair estimates. Named "Xactimate," the software is a program utilized by the insurance industry, roofing companies, and contractors to manage and price out property damage claims, and theoretically, it ensures that multiple adjusters provide the same pricing for a loss. Its purpose is to make a uniform system of adjusting and pricing insurance claims. Both Summit and Aspen use Xactimate to complete repair estimates for their customers.

After Summit rested at trial, Keller, Nussbeck, and Aspen moved for a directed verdict as to all claims. The district court denied the motions. All three defendants then rested without presenting any witnesses or evidence. Keller, Nussbeck, and Aspen renewed their motions for directed verdict at the conclusion of all evidence, and the motions were again denied.

After deliberating, the jury found in Summit's favor on the tortious interference claim against "some or all Defendants," in Summit's favor as to breach of fiduciary duty and duty of loyalty against Keller, and in Summit's favor on the civil conspiracy claim against all three defendants. The jury calculated damages in the amount of $396,172.

Keller, Nussbeck, and Aspen filed motions for judgment notwithstanding the verdict (JNOV) and a new trial. The district court denied the motions for JNOV. With regard to the motions for new trial, the court found that the evidence adduced at trial showed that the profit margin for an insurance repair job was a minimum of 30 percent but that there was no evidence as to what factors could be used to calculate a higher profit margin, whether a higher profit could be expected on the 17 jobs at issue here, or to what extent the profit could

- 249 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

be greater than 30 percent. The court therefore concluded that the jury engaged in speculation and conjecture in awarding profits above 30 percent. Accordingly, the court determined that the highest possible award for damages with a 30-percent profit margin was $284,911.29, the amount that was shown on a demonstrative exhibit Summit utilized during its closing argument. The district court further reduced the damages award by $13,713.93 because one homeowner declined to repair outbuildings on his property; thus, the court found that the jury engaged in speculation in awarding a loss of profit for work that was not performed. Finally, the damages award was reduced an additional $10,013.11 as a result of a downpayment Summit collected and retained from one of the 17 homeowners. The court's order therefore indicates that it partially granted the motions for new trial and reduced the award of damages to $261,184.25. Summit appeals, and Keller, Nussbeck, and Aspen cross-appeal.

## ASSIGNMENTS OF ERROR

On appeal, Summit assigns, restated, that the district court erred in (1) finding that there was insufficient evidence to support a damages calculation using a profit margin greater than 30 percent and (2) determining that evidence of repair by a homeowner as to a specific job was necessary.

On cross-appeal, Keller assigns that the district court erred in (1) denying his motion for JNOV, (2) denying his motion for directed verdict, (3) denying his motion for new trial, and (4) refusing a proffered jury instruction.

On cross-appeal, Nussbeck and Aspen assign, renumbered, that the district court erred in (1) denying their motion for JNOV, (2) denying their motion for directed verdict, (3) denying their motion for new trial, and (4) submitting jury instructions and a verdict form to the jury concerning Nussbeck and Aspen regarding breach of loyalty, breach of fiduciary duty, and civil conspiracy.

- 250 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

## ANALYSIS

Because of the nature of the assigned errors on appeal and cross-appeal, we address the issues raised in the cross-appeals first and then proceed to those raised by Summit on appeal.

### Motions for JNOV and Directed Verdict.

In their respective cross-appeals, Keller, Nussbeck, and Aspen assign that the district court erred in denying their motions for JNOV and directed verdict as to all claims. They generally argue that Summit failed to present sufficient evidence to support its claims and that thus, the matters should not have been submitted to the jury. We disagree.

[1-4] A motion for JNOV may be granted when the movant's previous motion for directed verdict, made at the conclusion of all the evidence, should have been sustained. *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 298 Neb. 777, 906 N.W.2d 1 (2018). To sustain a motion for JNOV, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id*. On a motion for JNOV, the moving party is deemed to have admitted as true all the relevant evidence admitted that is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *Id*. A motion for JNOV asks the trial court to revisit whether the movant's prior motion for directed verdict should have been granted as a matter of law. See *id*. The standard for a motion for directed verdict is the same. See *Anderson v. Babbe*, 304 Neb. 186, 933 N.W.2d 813 (2019). Review of a ruling on a motion for JNOV is de novo on the record. *LeRette v. Howard*, 300 Neb. 128, 912 N.W.2d 706 (2018). The question here, therefore, is whether after admitting as true all of the relevant evidence that is favorable to Summit and giving Summit the benefit of all proper inferences deducible from the relevant evidence,

- 251 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

reasonable minds could draw but one conclusion such that the issues should have been resolved as a matter of law.

[5] To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Thompson v. Johnson*, 299 Neb. 819, 910 N.W.2d 800 (2018). On cross-appeal, Keller, Nussbeck, and Aspen challenge only the first and third factors listed above. We therefore limit our review to whether Summit adduced sufficient evidence to submit those matters to the jury.

With respect to the first factor, a business expectancy was defined in the jury instructions in the instant case. The instructions provided that a written or oral contract is not necessary to establish a valid business relationship or expectancy; rather, a business expectancy may include a prospective contractual relationship if it was reasonably probable that the parties would have entered into a business relationship but for the unjustified interference. Neither party objected to that definition.

Upon our de novo review of the record, we conclude that there was sufficient evidence presented creating a factual question for the jury as to the existence of a valid business expectancy, so the court properly declined to resolve the issue as a matter of law. Stated differently, the cross-appellants argue that there was insufficient evidence from which the jury could decide that it was reasonably probable that the 17 homeowners at issue would have entered into business relationships with Summit but for the interference; we do not agree.

Several of the 17 homeowners signed contingency agreements with Summit, evidencing their intention that Summit complete the repair work. Although we recognize that the agreements did not bind the homeowners to utilizing Summit's

- 252 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

services, the jury could find that the agreements memorialized the homeowners' intentions to do so and that they would have done so but for the interference. To this point, Johnson testified that in his experience, it would be "[v]ery rare" to have a situation where a customer signed a contingency agreement and then did not end up having that company complete the work. He explained that when he has a signed contingency agreement from a customer, he "certainly expect[s]" to do the job.

A lack of a signed agreement does not mandate the conclusion that there was no expectation of business, however. According to Johnson, frequently an agreement is not signed until after the insurance adjuster has been to the house to assess the damage. Even Keller acknowledged that signing a contingency agreement is not one of the first things that occurs when contacting a homeowner. He explained that his practice while at Summit was to knock on the door of a home and meet with the homeowner, do an inspection of the property, create an estimate, speak with the insurance adjuster, and then talk to the homeowner again to finalize the work to be performed before writing up a contract. Keller explained that the purpose of doing an estimate prior to having a homeowner sign a contingency agreement was to gain the confidence of and build a relationship with the homeowner: In other words, to create a business expectancy.

In addition, Summit had created estimates for several of the 17 jobs, and according to Kantor, Summit had an expectation of business with the homeowners after creating an estimate for them. Kantor further testified that even in the instances where there were no signed agreements or estimates yet created, Summit had expended efforts with the homeowners beyond knocking on the door and meeting with the homeowner one time. According to Kantor, Summit had "client relationships" with all 17 homeowners.

Moreover, Keller testified that between June 6 and 13, 2014, Summit had sold over $500,000 worth of roofing jobs,

- 253 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

demonstrating that he considered the homeowners Summit spoke with during that timeframe to be a "sale" for which Summit would complete the repair work and earn a profit, regardless of whether there was a signed contingency agreement, creation of an estimate, or neither. Mirroring his testimony, Keller's June 13 email to Nussbeck, informing him that Summit had "over [$]500,000 sold over the last week" and expressing concern about Summit's ability to complete all of the work, again, indicates that he expected that Summit would complete the $500,000 in repair jobs despite the fact that not all of these "sales" had a signed contingency agreement or completed estimate. Giving Summit the benefit of all of the inferences from the above-recited relevant evidence, we conclude that the evidence was sufficient to submit the question of valid business expectancies for all 17 homes to the jury.

The third factor for establishing tortious interference with a business expectancy requires proof of an unjustified intentional act of interference on the part of the interferer. Keller, Nussbeck, and Aspen argue that the evidence was insufficient to show that any interference was unjustified.

[6] To assist in determining whether interference is unjustified, Nebraska has adopted the seven-factor balancing test of the Restatement (Second) of Torts § 767 (1979). See *Sulu v. Magana*, 293 Neb. 148, 879 N.W.2d 674 (2016). Under the Restatement's general test, factors to consider in determining whether interference with a business relationship is improper include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties. *Sulu v. Magana, supra*.

The Nebraska Supreme Court has recognized that § 767 of the Restatement provides that in making its analysis, the

- 254 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

fact finder is to engage in a balancing process and that the determination of whether an interference is improper depends upon a comparative appraisal of these factors. See *Huff v. Swartz*, 258 Neb. 820, 606 N.W.2d 461 (2000). Further, the decision is whether it was improper under the circumstances—that is, under the particular facts of the individual case, not in terms of rules of law or generalizations. *Id*. The Supreme Court additionally observed:

> "The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors."

*Id.* at 829, 606 N.W.2d at 468, quoting Restatement, *supra*, § 767, comment *b*. Accordingly, balancing and weighing the evidence relating to the seven factors of § 767 of the Restatement, and any other relevant factors, under the facts of this particular case in order to determine whether the interference was unjustified or improper is a factual determination to be left to the jury. Thus, the district court properly declined to decide the issue as a matter of law.

Keller, Nussbeck, and Aspen do not argue that the jury improperly assessed the relevant factors; instead, they claim that their actions amounted to permissible competition and cite to the Restatement (Second) of Torts § 768 (1979), which has been adopted in Nebraska. See, *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009); *Recio v. Evers*, 278 Neb. 405, 771 N.W.2d 121 (2009); *Miller Chemical Co., Inc. v. Tams*, 211 Neb. 837, 320 N.W.2d 759 (1982), *disapproved on other grounds, Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991). This so-called competitor's privilege

- 255 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

provides that one who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement, *supra*, § 768 at 39. The question here is whether "wrongful means" were used in the interference. If the actor employs wrongful means, he is not justified under the rule stated in § 768. See Restatement, *supra*, § 768, comment *e*.

The court in the present case instructed the jury on the definition of "unjustified" by listing the factors of §§ 767 and 768 of the Restatement. Neither party objected to that definition. According to the Restatement, *supra*, § 768, comment *e*., wrongful means include physical violence, fraud, civil suits, and criminal prosecutions, but the jury was not provided this or any definition of "wrongful means." Thus, determining what constitutes wrongful means was left for the jury's determination. We find that there was evidence from which the jury could determine that the interference was accomplished by wrongful means and was thereby unjustified.

Kantor admitted that Summit's database of customers was not a secret; however, it was not public knowledge either. Keller knew the names and addresses of the homeowners who had been contacted by Summit and that Summit's customer files were stored in Dropbox. Kantor testified that through Dropbox, he was able to "watch Summit jobs becoming Aspen jobs" after Keller left Summit. An employee of Summit also testified that she observed on her computer the movement of Summit's customer files in Keller's Dropbox after he left Summit and went to Aspen.

- 256 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

Furthermore, a photograph of one of the 17 residences, which had been taken by an independent contractor working on behalf of Summit, was included in an Aspen proposal. A June 19, 2014, proposal for windows for one of the 17 homes lists the customer as Aspen with Keller's phone number, but the project/delivery address is listed as Summit. On that same day, Keller released a lien that Summit had on a property, which typically would not be filed until payment had been made. On June 22, Keller, using his Summit email address, emailed a work order for one of the 17 homeowners to Nussbeck.

Keller acknowledged that after he left Summit, he had additional contact with the 17 homeowners and that he asked the other Summit representatives who converted to Aspen to talk to the customers with whom they had worked while at Summit. For one of the 17 homeowners, Keller told Kantor that he would inform her that he was leaving Summit but that she would be in "good hands" with Kantor and Summit; instead, Keller spoke with that homeowner and persuaded her to go with Aspen. In a June 24, 2014, text message, Keller informed Nussbeck that "Garth is flipped," and Nussbeck replied, "Awesome." At trial, Nussbeck denied knowing who "Garth" referred to, but it was the first name of one of the 17 homeowners.

It was clear that Keller stood to earn a significantly higher income through his employment with Aspen. He was paid an annual salary of $120,000 by Summit, but at Aspen, he stood to earn 50 percent of the profits from his job location (Omaha) and 50 percent of the profits of any specific job he sold. Given the amount of just the 17 properties involved in this case, it is apparent that Keller's compensation at Aspen would be significantly greater than his salary at Summit.

We understand that Keller had the ability to terminate his employment with Summit at any time and begin working for Aspen and thereafter to engage in competition with Summit. However, the question before us is whether, after admitting as true all of the relevant evidence that is favorable to Summit and giving Summit the benefit of all proper inferences deducible from the relevant evidence, reasonable minds could draw

- 257 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

but one conclusion. We conclude that based on the evidence outlined above, the jury could have found that it was wrongful and unjustified for Keller to transfer and utilize information obtained while working at Summit for the benefit of Aspen and himself. The district court therefore properly submitted to the jury the issues of whether Keller employed "wrongful means" and whether the interference was unjustified. As a result, the court did not err in denying the motions for directed verdict and JNOV as to the tortious interference claim.

We recognize that most of the evidence and actions cited above were taken by Keller, and to this point, Nussbeck and Aspen argue that there was insufficient evidence to submit to the jury the question of their liability for tortious interference with a business expectancy. The jury, however, also found in Summit's favor on the civil conspiracy claim against Keller, Nussbeck, and Aspen.

[7,8] In proving conspiracy to tortiously interfere with a business relationship, a claim of civil conspiracy is not actionable in itself, but serves to impose vicarious liability for the underlying tort of those who are a party to the conspiracy. *Koster v. P & P Enters.*, 248 Neb. 759, 539 N.W.2d 274 (1995). By establishing a civil conspiracy, a plaintiff extends liability for the wrongful acts underlying the conspiracy to those actors who did not actively engage in the acts, but conspired in their commission. *United Gen. Title Ins. Co. v. Malone*, 289 Neb. 1006, 858 N.W.2d 196 (2015).

In the present case, the jury's finding of a civil conspiracy extends liability for tortious interference to Nussbeck and Aspen. And with respect to the civil conspiracy claim, Keller, Nussbeck, and Aspen argue only that that claim fails because the underlying tort should fail. Having upheld liability on the tortious interference with a business expectancy claim, we affirm liability on behalf of all three cross-appellants as a result of the jury's finding of a civil conspiracy.

[9] We note that the cross-appellants also challenge the denial of their motions for JNOV and directed verdict as to the claims for breach of fiduciary duty and breach of loyalty.

- 258 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

Because we find no error in the jury's decision on the tortious interference claim against all three cross-appellants, we need not address whether it was error to submit the additional two causes of action to the jury. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the case and controversy before it. *City of Lincoln v. County of Lancaster*, 297 Neb. 256, 898 N.W.2d 374 (2017).

*Motion for New Trial.*

Keller argues that the district court erred in denying his motion for new trial. He claims that a new trial was warranted because the court erred in denying his proffered jury instruction, allowing Summit to rely upon Aspen estimates to prove its damages, and failing to further reduce the damages award based on Summit's failure to present evidence to support liability against Keller for some or all of the 17 repair jobs.

We can quickly dispose of Keller's first and third claims. As Keller explains in his brief, the jury instruction he offered at trial would have clarified that Keller was not an actual officer of Summit and therefore owed no fiduciary duty to the company. This claim and jury instruction were relevant only to the claims of breach of fiduciary duty and duty of loyalty. Because we have affirmed the jury's finding in Summit's favor as to the tortious interference with a business expectancy and civil conspiracy claims, we need not consider errors relating to the additional causes of action.

Similarly, in Keller's third claim in the context of his argument relating to his motion for new trial, Keller relies on his previous assertion that Summit failed to establish his liability relating to all 17 repair jobs, and therefore, Summit was not entitled to the damages resulting therefrom. Having already addressed and rejected those arguments above based on our finding that the evidence was sufficient for the jury to find Keller liable as to all 17 homeowners, we also reject his claim that the court should have further reduced the damages award.

With respect to Keller's second claim, he asserts that his motion for new trial should have been granted because the

- 259 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

court committed prejudicial error by allowing Summit to rely upon Aspen estimates to prove its lost profits. We disagree.

[10] An appellate court reviews a denial of a motion for new trial for an abuse of discretion. *Anderson v. Babbe*, 304 Neb. 186, 933 N.W.2d 813 (2019). We find no abuse of discretion here. Xactimate is an estimating software application used by roofing companies, contractors, and insurance companies to give an estimate for the amount of damages found. Both Summit and Aspen use it. As long as similar information is input into the software, whether an operator is working for Summit or Aspen, it should give the same estimate. As Johnson explained, the software's purpose is to make a uniform system of adjusting and pricing insurance claims.

Summit had not yet had the opportunity to create estimates for all 17 of the homeowners at issue here; however, Aspen not only prepared estimates for the customers, but it completed the repairs. Thus, its records were relevant to the profit Summit could have earned from those repair jobs. Because Summit and Aspen use the same software to create estimated costs for their customers, we find no abuse of discretion in denying the motion for new trial based on Summit's reliance on Aspen's estimates to prove the profits it would have earned but for the tortious interference.

[11] Although Nussbeck and Aspen also assigned as error the district court's denial of their motion for new trial, this error is not argued in their brief. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Diamond v. State*, 302 Neb. 892, 926 N.W.2d 71 (2019). To the extent the denial of their motion for new trial is incorporated into their argument relating to damages, we address those issues separately below.

*Damages.*

On appeal, Summit argues that the district court erred in reducing the jury's damages award for two reasons. Although we disagree with the procedure by which the court reduced

- 260 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

the damages, we affirm the court's decision to do so but modify the amount.

Before addressing the merits of Summit's arguments, we note the procedure by which the district court reduced the jury's damages award. Keller, Nussbeck, and Aspen filed posttrial motions for JNOV and new trial. The court's order indicates that it denied the motions for JNOV but granted the motions for new trial in part and then reduced the damages award on its own. In doing so, the court relied upon law regarding remittitur, which provides that where the damages awarded are excessive, and the excessive amount is distinguishable and subject to exact determination, the defect may be remedied by a remittitur of the excess. See *Nelson-Holst v. Iverson*, 239 Neb. 911, 479 N.W.2d 759 (1992). On these grounds, the district court reduced the jury's damages award.

However, a request for remittitur is generally made in lieu of a request for a new trial. *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018). See, also, *R & D Properties v. Altech Constr. Co.*, 279 Neb. 74, 776 N.W.2d 493 (2009) (holding that trial court should have granted remittitur, rather than new trial); *Barbour v. Jenson Commercial Distributing Co.*, 212 Neb. 512, 323 N.W.2d 824 (1982) (discussing where trial court has ordered reduction of verdict as condition of denying new trial); *McMillan Co. v. Nebraska E. G. & T. Coop., Inc.*, 192 Neb. 744, 224 N.W.2d 184 (1974) (affirming trial court's decision granting new trial upon plaintiff's refusal to file remittitur). But see *LeRette v. Howard*, 300 Neb. 128, 912 N.W.2d 706 (2018) (upholding trial court's partial grant of motion for JNOV and reduction of jury's award of damages, albeit in modified amount).

Here, the district court purportedly granted the motion for new trial on the issue of damages and also reduced the damages award. If a jury's award is excessive and the amount of excess can be estimated with reasonable certainty, the better practice is to deny a new trial on the condition that the plaintiff accept the lower amount of damages, and if the plaintiff rejects the remittitur, then order a new trial. See John

- 261 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

P. Lenich, Nebraska Civil Procedure § 31:14 (2020). As we explain below, we conclude that the amount of damages should have been determined as a matter of law, and thus, the district court should have granted the motions for JNOV and reduced the jury award accordingly. See *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 298 Neb. 777, 906 N.W.2d 1 (2018) (to sustain motion for JNOV, court resolves controversy as matter of law and may do so only when facts are such that reasonable minds can draw but one conclusion). We therefore affirm the court's conclusion that the jury award was not supported by the evidence adduced at trial and its reduction of the award, but modify the amount to that which is supported by the evidence.

The district court found that the evidence established that Summit's profit margin on insurance jobs such as these 17 jobs was at least 30 percent but that there was no evidence as to what factors could be used to calculate a higher profit margin, whether a higher profit could be expected on the 17 jobs present here, or to what extent the profit could be greater than 30 percent. As a result, the court determined that the jury engaged in speculation and conjecture in awarding profits above 30 percent.

[12] Damages, like any other element of the plaintiff's case, must be pled and proved, and the burden is on the plaintiff to offer evidence sufficient to prove the plaintiff's alleged damages. See *Pan v. IOC Realty Specialist*, 301 Neb. 256, 918 N.W.2d 273 (2018). Evidence of damages must be sufficient to enable the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness. *Id*. Proof of damages to a mathematical certainty is not required; however, a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural. *Id*.

[13] A claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness. *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011). The

- 262 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

Supreme Court has previously held that the claimant of damages must furnish appropriate data to enable the trier of fact to find such damages with reasonable certainty without resorting to conjecture or speculation. See *K & R, Inc. v. Crete Storage Corp.*, 194 Neb. 138, 231 N.W.2d 110 (1975). The court observed that where a plaintiff, in attempting to prove loss of profits, fails to produce available records relevant to such question, the plaintiff does not fulfill his or her obligation of proving damages with reasonable certainty. See *id*.

In the instant case, the only evidence of Summit's expected profit margin was adduced through Kantor's testimony. He explained that jobs covered by insurance, such as the 17 repair jobs at issue here, "will be fairly profitable, on the low end 30 percent, all the way up to 45 [percent]. You know, it goes—it goes up from there." He was asked, "You're saying the rough profit would be 30 percent on up for insurance work," and he responded, "Yes." Kantor expected to make "[a]t least 30 percent" profit on these jobs and repeatedly referred to a 30-percent profit margin as a "conservative" estimate. Kantor explained that overhead and profit could also be factored in and would be an additional 20-percent profit on top of the 30-percent profit margin included in the base cost of a job.

The Summit estimates that were received into evidence presumably include a certain profit margin but do not specify an exact percentage. The demonstrative exhibit Summit utilized in its closing argument contained figures from the Summit estimates, where available, and Summit informed the jury that the calculations on the exhibit represented a 30-percent profit margin, which was the jury's "starting point" for calculating damages. There was no evidence, however, as to where these 17 jobs would fall in the range of a 30- to 45-percent profit or what factors determine the profit margin on any given job. Further, there were no financial records or documentary evidence offered to support Summit's claim of a profit margin above 30 percent. Given the evidence that was presented at trial, we cannot conclude that the district court erred in

- 263 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

finding that the evidence of any profit margin greater than 30 percent was speculative and not supported by the evidence.

In order to recalculate damages, the court started with the figures shown on Summit's demonstrative exhibit, which was a compilation of Aspen's estimates, where available, and Summit's estimates where Aspen had none. The total of these estimates was shown as \$607,645.21. From that, Summit calculated a 30-percent profit of \$182,293.56 (\$607,645.21 × .30). Where applicable, it also added a 20-percent "Overhead and Profit" for an additional \$102,617.73. Adding the profit and "Overhead and Profit," Summit argued that the starting point for damages was \$284,911.29 (\$182,293.56 + \$102,617.73). The court determined that this amount was the maximum amount to which Summit was entitled. We agree.

We note that for the properties for which there was an Aspen estimate available, Summit utilized those figures on its exhibit; otherwise, the figures included on the exhibit were from Summit estimates. None of the parties object to the base figures included on the demonstrative exhibit; rather, they argue only regarding the evidence surrounding Summit's anticipated profit margin. Therefore, given the data included on the demonstrative exhibit, which is supported by the actual estimates offered and received into evidence, the district court did not abuse its discretion in initially reducing the damages to the figure shown on the exhibit.

Summit further argues that the district court erred in determining that evidence of repair by a homeowner as to a specific job was necessary and reducing the damages award by the amount of the work that the homeowner elected not to complete. The proper measure of damages presents a question of law. *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015). We conclude that the district court properly reduced the damages related to the incomplete work because the evidence established that the homeowner elected not to complete all of the work included in the initial estimate, so Aspen repaired only the dwelling on the property and not the outbuildings.

- 264 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
SUMMIT RESTORATION v. KELLER
Cite as 29 Neb. App. 243

Because all of the work was not ultimately completed, it was speculative for the jury to conclude that it would have been completed had Summit done the work instead of Aspen. As a result, Summit is entitled to lost profits only for the cost of the dwelling repair.

Although we agree with the district court's analysis, we disagree with its calculation's regarding this homeowner. Using documentation from Aspen, the estimated cost of the dwelling repair only for that particular homeowner was $56,630.36. The court properly reduced the amount of profit by $13,713.93, but failed to recalculate the reduced "Overhead and Profit" associated with this property. The "Overhead and Profit" equal to 20 percent of $56,630.36 would total $11,326.07. Replacing the numbers for this homeowner on the demonstrative exhibit leads to recalculated total damages of $236,469.07.

The court further reduced the jury award by the amount of a downpayment made by a homeowner that Summit was permitted to retain, and Summit does not assign this decision as error. We therefore affirm the further reduction of the total damages by $10,013.11. As a result, the modified total damages amount that is supported by the evidence and to which Summit was entitled equals $226,455.96.

## CONCLUSION

Based on the foregoing, we affirm the district court's decision to reduce the jury award but modify the court's calculation of damages to $226,455.96.

AFFIRMED AS MODIFIED.